02-11-345-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00345-CV

 

 


 
 
 In the Interest of A.W.
 
 
  
 
 
  
 
 
 
 
  
  
  
 
 


----------

 

FROM THE 431ST
District Court OF Denton COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

          Appellant
J.S.M. (Father) appeals the termination of his parental rights to his child, A.W.
(Alice).[2] 
We will affirm.

Background
Facts

Mother
and Father met in late 2008, in North Carolina.  Mother already had one child
from a previous relationship, A.S. (Ann).  Father told Mother his name was “Randal
Washington.”  At that time, Father claimed to own a “C&C business” that cut
wood for cabinets and a pressure washing business.

Mother
and Father broke up twice because “finances were bad.”  The first time she left
“without discussing it with him” because she was “sort of scared of him.”  The
second time Mother left, Father saw her packing and “grabbed [her] by [her] neck
and [sat her] down, sort of forcefully” and “[her] head had hit the wall.”  Mother
left him and moved back in with her parents.  After Mother found out she was
pregnant, she and Father started talking again and eventually she moved with
him to California where Father claimed he was working as a computer technician
for General Electric.  Father told Mother that he was also working as a special
agent for an international intelligence agency.  Father told Mother that she
was not allowed to see what he was working on, but he would do his secret work
on their home computer at night while she was sleeping.  He would sometimes “go
a couple of days with no sleep,” and he spent almost all of his day working on
the computer.

Alice
was born in California in December 2009.  In April 2010, Mother and Father
moved to a rental house in Garland.  Father did not have a job, but he planned
on starting a business selling computers that he built.  He had a stock of nine
computers that he had built for sale.  Mother attempted to get a job, but
Father would not allow her to work outside the home.

“Less
than a few months” before their arrest, Mother noticed that Father had begun a
fascination with gunpowder and homemade rockets.  Father bought two Glock
pistols for $1,800 because, as he told Mother, he wanted to start working as a
police officer while the computer business was getting started.  He bought the
guns from a friend who was a police officer in Frisco.  Mother was upset that
Father was spending money on guns instead of on rent.

One
day, the landlord, an “elderly man,” came to the house to talk to Father about
evicting him for failing to pay rent.  Father hit the landlord, whom Mother
later saw crying.  After being evicted from their house in Garland, the family
moved to the Fairfield Inn in Plano, where they lived for “a couple months.” 
While in the hotel, Mother said that Father only spoke of his spy agency work
to mention that he was considering “quitting.”  Two days before they were
arrested, Mother and Father moved out of the Fairfield Inn because they were a
“week or two behind” in paying their bill.  Since they had no money to move
into another hotel, the family was living in Father’s black Ford F-250 pickup
truck at the time of the arrests.  They put their belongings, except for what
they packed in the truck, into a storage unit in Plano.  Father told Mother he
was going to pack office supplies to take with him and some gunpowder to “test
something.”

          On
August 24, 2010, a police bulletin went out to Denton police officers regarding
a black Ford F-250 pickup truck with a license plate reading “THE KNG.”  The
people driving the truck were suspects in an unauthorized use of a motor
vehicle and theft of service investigation.[3]  Two Denton police offers
were in a parking lot of a Denny’s restaurant “a little after midnight” when
they saw the truck pull into the lot.  Father exited the truck and headed towards
the officers.  He was “dressed in a black T-shirt, black BDU pants, and combat
boots.”  Because the bulletin had cautioned that the suspects were armed, the
officers drew their weapons and commanded Father to get on the ground.  Father
complied and, during a frisk, was found to have a pocket knife on his person.  One
of the officers, Sergeant Matthew Cain, ordered the driver, who turned out to
be Mother, to exit the truck too.

          Cain
looked in the passenger compartment of the truck and found the two children. 
In the bed of the truck, Cain found chemicals, CO2 cartridges, pipes, canon
fuses, “containers . . . labeled smokeless powder and muzzleloading propellant,”
“primers” for reloading pistols and small rifles, grenades, plumber’s putty, and
other objects.  Cain described the items as “components for making a bomb.”  There
were also a number of handwritten prescriptions written out to Mother.  Inside
the passenger compartment, Cain found two Glock semiautomatic pistols and “an
assortment of badges that mimicked a legitimate federal agency.”  One pistol
was under the front passenger seat where Father had been sitting,
disassembled.  The slide and barrel of the pistol were in the unlocked glove
compartment.  The other pistol was in a backpack on the front passenger
floorboard.  It had ammunition in the magazine, but no round in the chamber.  Father
did not have a license to carry a concealed weapon.

          Father
was arrested that night, and the family was taken to the police station.[4] 
Cain testified that Father was “uncooperative, very adversarial, [and] argumentative.” 
Child Protective Services (CPS) was notified and sent Jamie Beasley, a CPS
investigator, to the police station to interview Mother.  Mother told Beasley
that Father worked for the “IIA,” which she described as a “black ops group.”  Mother
also told Beasley that the prescriptions in her name were for hydrocodone for
Father’s back pain.  She claimed to have no knowledge of any of the objects in
the bed of the truck except for “a little Ziploc of gunpowder” she thought he
packed.  She said that Father had only started amassing the items found in the
truck within the previous six months.  Mother was arrested at the station for
child endangerment and CPS took the children because, with both parents in
custody, there was no caretaker for the children.  The children were placed in
foster care.

Julie
Westlake, a CPS supervisor, visited Father in jail.  He introduced himself as Randal
Washington.  Father told Westlake that he worked for “the national security”
and that if he could call the CIA, they would be able to clear up this
“misunderstanding.”  He explained his criminal history was the result of an
undercover operation in Arizona and that the ID badges in the truck were a part
of that operation.  He told Westlake that he had “military training in
explosives,” but he would not describe the training.  He also said he was
teaching Ann to shoot BB guns.

The
police eventually discovered that Randal Washington was not Father’s real name
and that he was on probation in North Carolina.  Father’s only excuse for the
fake name was that “his family had called him [Randal Washington] since the
time he was five or seven and that it stuck, and so he’s always gone by [Randal
Washington].”  Mother also learned that—in addition to the ex-wife and children
Father had told Mother he had but whom he had refused to let Mother contact—Father
had an ex-wife in Oklahoma whom he had married under his legal name.

Mother
pleaded guilty in order to get her children back, and she received five years’
probation.[5]  Father refused to
complete any services and refused to sign his family plan review so that CPS
could file it with the court.  CPS filed to terminate Father’s rights to
Alice.  After a bench trial, the trial court found by clear and convincing
evidence that Father (1) knowingly placed or knowingly allowed Alice to remain
in conditions or surroundings that endangered her physical or emotional
well-being; (2) engaged in conduct that endangered Alice’s physical or
emotional well-being; (3) constructively abandoned Alice; and that termination
of the parent-child relationship is in Alice’s best interest.  See Tex.
Fam. Code Ann. § 161.001(1)(D), (E), (N), (2) (West Supp. 2011).  This
appeal followed.

Standard
of Review

Father
challenges the legal and factual sufficiency of the trial court’s findings.  A
parent’s rights to “the companionship, care, custody, and management” of his or
her children are constitutional interests “far more precious than any property
right.”  Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397
(1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  In a termination
case, the State seeks not just to limit parental rights but to erase them
permanently—to divest the parent and child of all legal rights, privileges,
duties, and powers normally existing between them, except for the child’s right
to inherit.  Tex. Fam. Code Ann. § 161.206(b) (West 2008); Holick v.
Smith, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination
proceedings and strictly construe involuntary termination statutes in favor of
the parent.  Holick, 685 S.W.2d at 20–21; In re R.R., 294 S.W.3d
213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination is in
the best interest of the child.  Tex. Fam. Code Ann. § 161.001 (West Supp.
2011); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be
established; termination may not be based solely on the best interest of the
child as determined by the trier of fact.  Tex. Dep’t of Human Servs. v.
Boyd, 727 S.W.2d 531, 533 (Tex. 1987); In re D.T., 34 S.W.3d 625,
629 (Tex. App.—Fort Worth 2000, pet. denied).

Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code
Ann. § 161.001; see also § 161.206(a).  Evidence is clear and
convincing if it “will produce in the mind of the trier of fact a firm belief
or conviction as to the truth of the allegations sought to be established.”  Id.
§ 101.007 (West 2008).  Due process demands this heightened standard
because termination results in permanent, irrevocable changes for the parent
and child.  In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see In
re J.A.J., 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for
termination and modification).

In
evaluating the evidence for legal sufficiency in parental termination cases, we
determine whether the evidence is such that a factfinder could reasonably form
a firm belief or conviction that the grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We review all the evidence in
the light most favorable to the finding and judgment.  Id.  We resolve
any disputed facts in favor of the finding if a reasonable factfinder could
have done so.  Id.  We disregard all evidence that a reasonable
factfinder could have disbelieved.  Id.  We consider undisputed evidence
even if it is contrary to the finding.  Id.  That is, we consider
evidence favorable to termination if a reasonable factfinder could, and we
disregard contrary evidence unless a reasonable factfinder could not.  Id.

We
cannot weigh witness credibility issues that depend on the appearance and
demeanor of the witnesses, for that is the factfinder’s province.  Id. at
573, 574.  And even when credibility issues appear in the appellate record, we
defer to the factfinder’s determinations as long as they are not
unreasonable.  Id. at 573.

In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the judgment with our
own.  In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We determine
whether, on the entire record, a factfinder could reasonably form a firm
conviction or belief that the parent violated (D), (E), and (N) of section
161.001(1) and that the termination of the parent-child relationship would be
in the best interest of the child.  Tex. Fam. Code Ann. § 161.001; In
re C.H., 89 S.W.3d 17, 28 (Tex. 2002).  If, in light of the entire record,
the disputed evidence that a reasonable factfinder could not have credited in
favor of the finding is so significant that a factfinder could not reasonably
have formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient.  H.R.M., 209 S.W.3d at 108.

Discussion

I.     Grounds
for removal

          In
his first two issues, Father argues that there is legally and factually
insufficient evidence to support the trial court’s finding that he knowingly
placed or knowingly allowed Alice to remain in conditions or surroundings which
endangered her physical or emotional well-being.  In his third and fourth
issues, Father challenges the legal and factual sufficiency of the evidence
supporting the trial court’s finding that he engaged in conduct which
endangered Alice’s physical or emotional well-being.  In his fifth and sixth
issues, Father challenges the legal and factual sufficiency of the evidence
supporting the trial court’s finding that he constructively abandoned Alice.

“Endanger”
means to expose to loss or injury, to jeopardize.  Boyd, 727 S.W.2d at
533; In re J.T.G., 121 S.W.3d 117, 125 (Tex. App.—Fort Worth
2003, no pet.).  Under (E), the relevant inquiry is whether evidence exists
that the endangerment of the child’s physical well-being was the direct result
of the parents’ conduct, including acts, omissions, or failures to act.  See
J.T.G., 121 S.W.3d at 125; see also Tex. Fam. Code Ann. §
161.001(1)(E).  Additionally, termination under (E) must be based on more than
a single act or omission; the statute requires a voluntary, deliberate, and
conscious course of conduct by the parent.  J.T.G., 121 S.W.3d at 125; see
Tex. Fam. Code Ann. § 161.001(1)(E).  It is not necessary, however, that the
parent’s conduct be directed at the child or that the child actually suffer
injury.  Boyd, 727 S.W.2d at 533; J.T.G., 121 S.W.3d at 125.  The
specific danger to the child’s well-being may be inferred from parental
misconduct standing alone.  Boyd, 727 S.W.2d at 533; In re R.W.,
129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).  To determine
whether termination is necessary, courts may look to parental conduct occurring
both before and after the child’s birth.  In re D.M., 58 S.W.3d
801, 812 (Tex. App.—Fort Worth 2001, no pet.).

A.    The
evidence

                 1.  The false identity and
intelligence agency

          Father
was indicted by a federal grand jury for a violation of 18 U.S.C. § 912
for false personation of a federal officer or employee.  Father had no
reservations about this claim, even using his fictitious name and claim of
membership in an international agency with the CPS worker who interviewed him. 
Tracy Murphree, a Texas Ranger, testified that if he had been at the scene, it
would have “raise[d] [his] alarm a great deal” to discover that Father had fake
badges for an intelligence agency.  As he explained,

If someone believes
that—police officers or federal agents could be granted access to a number of
areas or to a number of people, if people believe or are under the assumption
that they’re a federal agent or a police officer.

 

Someone
who is pretending to be that and is in possession of this type of stuff could
pose a threat to many different areas.

In fact,
Mother testified that Father, a person who was a fugitive from justice and on
probation, was able to buy the two Glock pistols from his police officer friend
because the friend believed Father was some sort of secret agent, and he hoped
Father would join the Frisco police force.

          Mother
testified that she now believes that she did not even know the man who was the
father of her younger child.  She did not know his true name, that he was on
probation in North Carolina, or that he had two ex-wives.  She had believed his
stories about working as an intelligence agent.  While she testified that prior
to the arrests, she did not believe he would deliberately harm the children,
after learning the truth about Father and the extent of his possession of
bomb-making components, she understood that, in fact, the children were in
danger.

Father
was dishonest with CPS in regard to his name, his background, and his
profession.  Beasley testified that Father’s dishonesty was a problem.  CPS was
unable to do any background checks on Father until it found out his real name. 
Mother was unable to protect the children because she did not know the truth
about Father’s identity or employment.  He told the CPS supervisor, Julie
Westlake, that he worked in national security.  He said that his arrest was the
result of a “big misunderstanding” and that if he could call the CIA, he could
clear it up.  He told Westlake that he had a criminal history, but only because
he was arrested while “undercover in Arizona on a motor vehicle operation.”  He
told her that he had military training in explosives but refused to explain
what that training was.  Once CPS discovered Father’s real name, he explained
that his family had called him Randal Washington since he was young so he has
“always gone” by Randal Washington.  This testimony conflicts with the divorce
documents from Oklahoma referencing Father by his true name.  However, this did
not explain why he did not tell anyone about his real name, why he maintained a
false identity with Mother, even giving their child his false last name, or why
he had identification under the fake name and no identification with his legal
name.

There
was no evidence that the “IIA” is a legitimate intelligence organization or
that Father actually worked for any sort of national security agency.  Mother
testified that she never saw any paychecks or any kind of documents
demonstrating Father’s affiliation with the organization.  If Father
purposefully lied about the “IIA,” the trial court could have believed that Father
was dangerous because he was dishonest with his wife, his friends, the police,
and CPS.  See In re S.K., 198 S.W.3d 899, 906–07 (Tex. App.—Dallas 2006,
pet. denied) (upholding finding that Mother engaged in endangering conduct
when, among other things, several witnesses testified as to her dishonesty).  If
Father did work for this agency, the trial court could have believed that
Father was a danger because he conducted his secret spy work from the home.  If
Father actually believed he worked for the nonexistent agency, the trial court
could have believed that Father had lived in a fantasy world and not in
reality.  Under all of these scenarios, Father’s statements were not supported
by any evidence, and the trial court was free to disbelieve him.

2.  Instability

          Father
spent $1,800 on guns he was not legally allowed to own instead of paying rent
for the family’s house.  Because of Father’s actions, including his refusal to
allow Mother to work outside the home to supplement his income, the family had
to move into a hotel and then their truck.  Jaime Beasley testified that this
nomadic lifestyle was dangerous to the children because “[t]he children did not
have a stable environment to live.”

          Mother
testified that there were problems in their relationship throughout the
approximately two years they had been together.  The issues included financial
problems stemming from Father’s lack of employment, housing, and transportation,
and his unwillingness to allow her to work.  She also testified to “anger problems
that were there in the relationship.”  She specifically described an instance
of physical abuse on her by Father and repeatedly, throughout her testimony,
described herself as scared of him.

          Mother’s
testimony described the unstable and somewhat nomadic lifestyle they lived with
their children.  Because of the frequent moves the family made, Mother could
not keep her older child Ann in school.  As a result, Ann was behind in her
math and reading skills and had issues dealing with her peers while in foster
care.

          The
testimony of all the witnesses showed that the children appeared to be well
cared for at the time of the parents’ arrests.  This fact cannot, however, be credited
to good parenting by Father.  Mother testified that Father did his secret spy work
at home, staying up for days at a time working on his computer and as a result,
“[she] ran all the errands and took care of the kids and did the chores, took
care of everything else so he could work.”  Father’s own counsel confirmed
through his questioning of Mother that the problems the children were having were
because of the “bouncing back and forth between hotel rooms and jobs” were
problems Mother had to work to correct.  He asked,

Q  And in fact, that’s
the reason why you were taking those extra steps as a mom to make sure those children
were still well cared for, correct?

 

A.  Correct.

 

Q. Well fed, well
clothed, medical problems, there weren't any, correct?

 

A.  Correct.

          The
terminal event in Father’s endangering course of conduct occurred on the night
of his arrest.  The Denton police had received a bulletin warning that Father,
dressed in military clothing, was to be considered armed and therefore
dangerous.  When he reached the parking lot where he was arrested, Father
exited his vehicle and began to approach a police patrol car at a fast pace,
which caused the officers on the scene to suspect “some ominous thing that
might be fixing to happen.”  After the police ordered Father on the ground,
they kept their guns drawn and approached the vehicle in which Father had
arrived, and they found Mother and her two children.  Mother described how the
officer approached her with his gun pointed at her face and yelled very
loudly.  She further described how the children awoke in the middle of the
night to this scene, surrounded by police and firefighters.  This event itself
was the culmination of Father’s deceit and dangerous conduct.

3.  The weapons

          Father
did not dispute that he had two semiautomatic pistols “probably no more than
four feet” from where the children sat in the truck.  Although one pistol was
disassembled, the other had ammunition in the magazine and was found in a
backpack on the front floorboard.  Cain testified that it would not be
difficult for a six-year-old child to cycle the pistol’s slide to put a bullet
in the chamber of the gun.  Murphree also testified that a six-year-old child would
have the strength to load the pistol.  Beasley also believed that the gun could
have been a danger to the children because Ann could have had access to it.  CPS
caseworker Rebecca Martin testified that Ann was a very active child who often
got into things she was not supposed to touch, such as Martin’s purse and a
gift bag.

Father
also did not dispute that he did not have a license for the weapons or that he acquired
them from a friend who believed that Father was an international intelligence
agent.  Westlake testified that committing a felony in the presence of a
parent’s child constitutes neglectful supervision as does placing a child in a
dangerous situation because the child “could be harmed or injured based on [the
parent’s] behavior or . . . actions.”  Westlake did testify that there was no
evidence that the children had been left alone with the weapons.

4.  The items in the truck bed

Cain
testified that he found the items in Father’s truck worrisome because “they’re
components for making a bomb.”  He believed the items could cause harm to Alice
and Ann.  He did admit that the items could be purchased at various stores and
individually, “in and of themselves,” they were not dangerous.  But he also
testified that harmless objects could be put together to make dangerous
explosives “within a few minutes.”  Westlake also testified that “[t]here are
concerns for children’s safety when they’re around things like ammunitions and
chemicals.”  She expressed concern that the children had access to guns and
that they could ingest the chemicals found in the truck.

Texas
Ranger Murphree also testified that the items were a concern because, as he
stated, “You have all the elements here to create some very powerful and deadly
bombs.”  He said that the grenades were dummy grenades but that they could be
made into live grenades by adding pellets and a fuse, both of which were found
in the truck.  Murphree also testified that the pellets could be used as
shrapnel for a pipe bomb.  He did not believe that someone with those items was
just playing with rockets and fireworks.  Murphree admitted that, individually,
there were other possible purposes for the items found in the truck, but he
could think of no other reason someone would have all the items found in
Father’s truck except to make bombs.  He said that as a Texas Ranger, if he had
come upon the truck and had seen the items in the bed, he “would immediately
back out and [he] would call a bomb squad to come in and take care of that
situation.”  He believed that a parent who possessed the type of items found in
the truck was “absolutely” a threat to the health and safety of his child.

          Cain
testified that the muzzleloader propellant and percussion caps are used by
hunters during deer season, but Mother testified that Father was never
interested in guns until a few months before their arrest, and there was no
testimony that Father was a hunter.  Cain testified that the “blanks” found in
the truck could be used “for a device that’s used to set nails in concrete” and
that the pipes and plumber’s putty could also be used in home construction.  But
there was no testimony that Father was involved in any home construction
projects.

          B.    The
evidence was legally and factually sufficient to support termination under (E).

 

Cain
testified that he believed that Father had placed the children in danger

[f]or [sundry]
reasons.  One is that he had reportedly been claiming to be a federal agent,
and he’s walking around with fictitious badges and I.D. cards purporting that,
as well as being armed.

 

Then
on top of the [sundry] explosive components that he had in the vehicle, I think
there’s some real threats to their physical well-being with what we came across
that night and the items in that vehicle and the behavior that he had been
exhibiting.

Based
on what he observed the night of the arrests, Cain believed, based on his
thirteen years of law enforcement experience, that the children were at risk of
harm.  Westlake testified that taken as a whole, the items in the truck,
Father’s deception, and his actions led her to believe that the children were
in danger and could be harmed physically, emotionally, or psychologically.  Mother
testified that she believed her children had suffered because of Father’s
actions.  The CPS caseworker, Rebecca Martin, also testified that she believed
that Father’s conduct endangered the children.  Lori Powell testified that CASA
believed that that Father was endangering the children and that “being involved
in such an unstable lifestyle, being subject to police intervention and arrest
was not a suitable environment for either of these children to be living in.”

As
stated above, an actual injury does not have to happen before a child can be
permanently removed from an endangering parent.  See Boyd, 727
S.W.2d at 533; J.T.G., 121 S.W.3d at 125.  Although Father had not yet
built a functioning bomb at the time of his arrest, the trial court could
believe that Father had put the materials in the truck (instead of storing them
in the family storage unit) because he intended to build one imminently.  Considering
that the family had been living in a hotel and then a truck, and that Father’s
work history consisted of computer building and some fence building, the trial
court was free to believe that Father was not involved in home construction
projects that necessitated setting nails into concrete or fixing plumbing.  The
trial court was free to believe that the items in Father’s truck were not for
separate projects or that, only by mere coincidence and happenstance, had wound
up in proximity to each other.  The trial court could believe that the items
had been collected together for the purpose of constructing a pipe bomb and that
Father had no other purpose for items except for building such a bomb.  That
Father collected the items and weapons over a span of six months and that he
continued for at least a year to tell others he was an agent of the “IIA” is
evidence of a voluntary, deliberate, and conscious course of conduct.  See
J.T.G., 121 S.W.3d at 125.

          Further,
Father’s frequent uprooting of the family is conduct that “subjects a child to
a life of uncertainty and instability” and endangers the physical and emotional
well-being of a child.  In re R.W., 129 S.W.3d 732, 739 (Tex. App.—Fort
Worth 2004, pet. denied).  Father lied about his identity and employment for
years.  Under this guise of being an officer of an intelligence agency, Father
procured weapons and the “elements . . . to create some very powerful and
deadly bombs,” which he carried around in the vehicle in which his family was
living.  Although it is unclear why Father engaged in this façade, the trial
court could have believed that Father’s preoccupation with fireworks, guns,
explosions, and grenades could prevent Father from protecting the physical and
emotional well-being of Alice.  See In re M.E.-M.N., 342 S.W.3d
254, 262 (Tex. App.—Fort Worth 2011, pet. denied) (“[A] parent’s mental state
may be considered in determining whether a child is endangered if that mental state
allows the parent to engage in conduct that jeopardizes the physical or
emotional well-being of the child.”).  In addition, the trial court could have
believed that Father’s focus on his spy work on the family’s home computer
(where he would sit for “over 90 percent of his time” and sometimes for a few
days without sleep) interfered with Father’s ability to secure employment and
provide for the family.  Father spent $1,800 on pistols instead of rent,
forcing the family to move from its house into a hotel room.

The
clear and convincing evidence supports the trial court’s finding that Father engaged
in a course of conduct that endangered Alice.  Accordingly, we hold that the
evidence is both legally and factually sufficient to support the trial court’s
termination findings under subsection (E).  We overrule Father’s third and
fourth issues.  Because, along with a best interest finding, a finding of only
one ground alleged under section 161.001(1) is necessary to support a judgment
of termination, we need not address Father’s first, second, fifth, and sixth issues. 
See Tex. R. App. P. 47.1; see also In re E.M.N., 221 S.W.3d 815,
821 (Tex. App.—Fort Worth 2007, no pet.).

II.    Best
interest

          In
his seventh and eighth issues, Father challenges the legal and factual
sufficiency of the evidence supporting the trial court’s finding that
termination of his parental rights is in Alice’s best interest.

There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child’s best interest.  Tex. Fam. Code Ann. § 263.307(a) (West
2008).  The following factors should be considered in evaluating the parent’s
willingness and ability to provide the child with a safe environment:

(1)   the child’s age
and physical and mental vulnerabilities;

 

(2)   the frequency
and nature of out-of-home placements;

 

(3)   the magnitude,
frequency, and circumstances of the harm to the child;

 

(4)   whether the
child has been the victim of repeated harm after the initial report and
intervention by the department or other agency;

 

(5)   whether the
child is fearful of living in or returning to the child’s home;

 

(6)   the results of
psychiatric, psychological, or developmental evaluations of the child, the
child’s parents, other family members, or others who have access to the child’s
home;

 

(7)   whether there
is a history of abusive or assaultive conduct by the child’s family or others
who have access to the child’s home;

 

(8)   whether there
is a history of substance abuse by the child’s family or others who have access
to the child’s home;

 

(9)   whether the
perpetrator of the harm to the child is identified;

 

(10) the willingness
and ability of the child’s family to seek out, accept, and complete counseling
services and to cooperate with and facilitate an appropriate agency’s close
supervision;

 

(11) the willingness
and ability of the child’s family to effect positive environmental and personal
changes within a reasonable period of time;

 

(12) whether the
child’s family demonstrates adequate parenting skills, including providing the
child and other children under the family’s care with:                                                                          

 

(A) minimally
adequate health and nutritional care;

 

(B) care, nurturance,
and appropriate discipline consistent with the child’s physical and
psychological development;

 

(C) guidance and
supervision consistent with the child’s safety;

 

(D) a safe physical
home environment;

 

(E) protection from
repeated exposure to violence even though the violence may not be directed at
the child;  and

 

(F)  an understanding
of the child’s needs and capabilities; and

 

(13) whether an
adequate social support system consisting of an extended family and friends is
available to the child.

Id. § 263.307(b);
R.R., 209 S.W.3d at 116.

Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include:

(A) the desires of
the child;

 

(B) the emotional and
physical needs of the child now and in the future;

 

(C) the emotional and
physical danger to the child now and in the future;

 

(D) the parental
abilities of the individuals seeking custody; 

 

(E) the programs
available to assist these individuals to promote the best interest of the
child;

 

(F)  the plans for
the child by these individuals or by the agency seeking custody;

 

(G) the stability of
the home or proposed placement;

 

(H) the acts or
omissions of the parent which may indicate that the existing parent-child
relationship is not a proper one; and

 

(I)   any excuse for
the acts or omissions of the parent.

Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be
sufficient in a particular case to support a finding that termination is in the
best interest of the child.  Id.  On the other hand, the presence of
scant evidence relevant to each factor will not support such a finding.  Id.

          A.    The
evidence

Alice
was just nine months old at the time of her parents’ arrest and twenty-one
months old at the time of trial.  See Tex. Fam. Code Ann. § 263.307(b)(1). 
Because of Alice’s young age, she is unable to express any fear of returning to
her home.  However, Mother testified that she feared Father.  She said she knows
“what [Father is] capable of” and she described it as “scary.”  See id. § 263.307(b)(5). 
Although Mother believed that Father would not purposely hurt the children,
based on his past acts, she did not know if Father would be able to put Alice’s
safety first.

Father
was imprisoned throughout the case and refused to participate in services, so he
completed no psychiatric evaluations.  See id. § 263.307(b)(6).  However,
because there was no evidence to support Father’s assertions that he was a “black
ops” secret agent, the trial court could have had concerns for Father’s mental
state or health.

Both
Beasley and Westlake testified that there was no indication of neglect or
physical or sexual abuse.  See id. § 263.307(b)(7).  The indictment in
Father’s pending federal criminal case, which was submitted into evidence in
this case, showed that Father had been convicted of domestic violence in
Oklahoma.  Mother testified that Father was never abusive to her or the
children, but she also testified that he once grabbed her by her neck and threw
her so hard onto the couch that she hit her head against the wall, which scared
her.  She also recalled Father punching their elderly landlord and leaving the
man crying when the landlord had come to talk to them about late rent.

          Beasley
testified that the initial report she received from CPS did not indicate any
concerns for drug use.  See id. § 263.307(b)(8).  Mother testified that
Father was taking hydrocodone for back pain on a regular basis and “an
antidepressant to be paired up with the hydrocodone.”  She also said that
Father also had either Xanax or a muscle relaxer.  Father got the prescriptions
by going to a doctor every month, except for the Xanax, which Mother admitted
was not legitimately prescribed to him.  Mother testified that Father abused
the hydrocodone on “bad days.”

The
CPS caseworker said that Father did not want to work services because he did
not want CPS involved in his private life.  See id. § 263.307(b)(10). 
He questioned why CPS would want to see his home or verify his employment.  He
told CPS that he did not understand how the services—including a psychological
evaluation, drug assessment, and counseling—were going to help him be a better
parent.  He said he would do the services “to check the box,” but he never
completed any services.  Although there was no evidence of what services were
available to Father in the jails in which he was incarcerated, he did have the
ability to write letters to his children or to call CPS.  CPS never received any
communications from Father.  There was no evidence that Father attempted to
participate in any type of parenting or educational services through the jails.

CPS
gave him a form to fill out with the names of family or friends who could care
for the children while the parents were incarcerated.  Father told CPS he
wanted the children to be placed with Mother’s parents or his grandparents, but
he could not give CPS his grandparents’ names or address.  In December 2010,
Father told CPS that he wanted to relinquish his parental rights, but he never signed
any required form to accomplish this.  In March 2011, the CPS caseworker
brought Father the family plan that CPS needed to file with the trial court. 
Father refused to look at it, discuss it, or sign it.

Mother
testified that she has not “seen anything as of yet to show or prove that he
knows what he did is not right [or that] he wants to be a better person.”  See
id. § 263.307(b)(11).  Rebecca Martin, the CPS caseworker, testified that
Father was “very resistant to being involved in this case.  He was very
uncooperative, but he was very focused on explaining every detail of the night
of the . . . 24th of August.”  He expressed to Martin no concern that the
flammable items in the truck could have been a danger to the children.  He told
Martin that he did not think CPS had a right to have a case open against him,
so he did not want to work services.  Lori Powell of CASA testified that Father
“did not indicate that he felt responsible for the situation that they were in
or that he had any remorse over it.”

Cain
testified that he saw no evidence that the children were dirty or needed any
medical attention.  See id. § 263.307(b)(12)(A).  Beasley also testified
that the children were appropriately dressed, appeared well nourished, and
their appearance did not “trigger any concerns.”  Cain also testified that
there was no evidence that the children were being physically mistreated.  See
id. § 263.307(b)(12)(B).  Mother testified that her older daughter was
behind in math and reading skills and that she had been homeschooling her
because of the frequent moves.  Mother said that Ann would have “[d]efinitely,
definitely” been in school had they lived in a stable home with a stable
income.  Martin testified that Ann frequently lied, and Martin believed that
Ann’s behavior was the result of watching Father “lie, be manipulative, and
deceive people on a daily basis.”

Mother
told CPS that she and Father had been teaching Ann “simple gun safety, to stay
away from guns,” but that they had not taught Ann how to shoot them.  See
id. § 263.307(b)(12)(C).  At trial, Mother testified that Father was
teaching Ann to shoot a BB gun.  Westlake also testified that Father told her
that he had taught Ann to shoot a BB gun.  Cain testified that Ann had said she
knew how to shoot a gun, and that caused him concern.

Beasley
testified that there was no evidence that the hotel rooms were dangerous living
circumstances.  See id. § 263.307(b)(12)(D).  However, she also
testified that moving the children from hotel to hotel and living in the truck
was a dangerous, unstable environment.  Powell also testified that the
children’s emotional well-being was affected by “being involved in such an
unstable lifestyle.”

The
CASA advocate testified that Mother has demonstrated throughout the case that
she can be successful in raising the children on her own.  See id. § 263.307(b)(13). 
Mother receives child support from Ann’s father to care for Ann.  Mother’s
family has supported Mother emotionally and financially throughout this case. 
Mother believes she can raise Alice without financial support from Father. 
Mother said, “[T]hey’re in my care now, and I want to take the best possible
care that I can of them and not put them at risk for anything ever again.  They’ve
suffered enough.”  She believed she has the ability to care for the children on
her own.

Martin
testified that she believed it was in Alice’s best interest to terminate
Father’s rights because he “has not completed any services to better his
parenting skills and ability to care for these children” and because he has no
acceptable plans for a living arrangement or employment.  Mother testified that
she believed termination of Father’s rights was in Alice’s best interest.  She
said,

It’s—like everything
about this case, it’s the combination of everything that makes it hard to—like,
I wonder why all this had to happen with kids involved.

 

A single man, sure,
go play with model rockets, and, you know, I don’t care.  Just—but we had
children in the home, trying to make a family work, trying to get financially
stable; and he’s got a fake name, false identifying, he works for an agency,
refusing to get a job, and then to top it off with all this stuff in the home.  And
myself or anybody else, we still don’t know why this was.

So
I would want to keep my children in a safe, stable, trustworthy home so they
don't have anything to be afraid of.

B.    The
evidence is legally and factually sufficient to support the best interest
finding.

 

The
State presented three witnesses who testified they believed that termination
was in Alice’s best interest, and no witnesses testified to the contrary. 
Father made no attempt to participate in services or to communicate with his
daughter at any time during the year this case was pending.  See In
re V.V., 349 S.W.3d 548, 558 (Tex. App.—Houston [1st Dist.] 2010, pet.
denied) (upholding best interest finding when father had not attempted to seek
information about his daughter’s well being and had not sought services that
might assist him in improving his parenting skills); In re J.L.R., No. 11-05-00094-CV,
2006 WL 728069, at *2 (Tex. App.—Eastland Mar. 23, 2006, no pet.) (holding
evidence legally and factually sufficient to support best interest finding when
father had limited contact with child and was currently incarcerated).  He has
a history of violence and recently became interested in guns and explosives.  See
V.V., 349 S.W.3d at 558 (upholding best interest finding because trial
court “could have inferred that the father’s consistent, and at times violent,
criminal conduct would put a child in his custody in emotional and physical
danger now or in the future”).  He has expressed no concern over having the
weapons and chemicals in the same truck in which his children had to sleep because
he spent the family’s rent money.  He prohibited Mother from getting a job and
kept her isolated from friends.  He has unapologetically lied to the police,
CPS, and his own wife about his employment, his identity, and his background.  See
In re M.H., 319 S.W.3d 137, 151 (Tex. App.—Waco 2010, no pet.) (upholding
best interest finding because mother’s repeated lies about non-existent medical
conditions caused the children to “suffer[] emotionally and physically”). 
Seven months before trial, Father told CPS that he wanted to relinquish his
rights to Alice.  See In re T.M.J., 315 S.W.3d 271, 278–79 (Tex. App.—Beaumont
2010, no pet.) (upholding best interest finding when, among other things,
mother’s counselor testified that mother “expressed little concern about the
children, lacked interest in them, lacked motivation to help herself or the
children, and that at one time, . . . [she] expressed the belief that the
children should not be returned to her”).

Based
on the evidence presented at trial and considering the relevant statutory and Holley
factors, we hold that, in light of the entire record, the trial court could
have reasonably formed a firm conviction or belief that termination of Father’s
parental rights to Alice was in Alice’s best interest.  Accordingly, the
evidence in the record is both legally and factually sufficient to support the trial
court’s best interest finding.  We overrule Father’s seventh and eighth issues.

Conclusion

Having
overruled all of Father’s dispositive issues, we affirm the trial court’s
judgment.

 

 

 

LEE GABRIEL
JUSTICE

 

PANEL: 
LIVINGSTON,
C.J.; GARDNER and GABRIEL, JJ.

 

DELIVERED:  March 22, 2012









[1]See Tex. R. App. P. 47.4.





[2]We use aliases for the
children and all real and fictional names of the parents throughout this opinion. 
See Tex. R. App. P. 9.8(b)(2).





[3]The truck had not been
stolen.  The bulletin also warned that the suspects had rifles, which was also
not true.  There was no evidence regarding the source of the information in the
bulletin.





[4]Father was charged with child
endangerment.  Mother believes he was charged with crimes stemming from his
false identity.  He was also later charged in federal court with possession of
an unregistered firearm, possession of a firearm by a fugitive of justice,
possession of a firearm by a prohibited person because of a domestic violence
misdemeanor in Oklahoma, and false personation of an officer or employee of the
United States government.





[5]The children were returned
to Mother on a “return and monitor.”